**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALEXANDRIA MCELHANNON,

|  | CIVIL ACTION NO. 2:16-cv-13546 |
|---|---|
| *Plaintiff*, | DISTRICT JUDGE ARTHUR J. TARNOW |
| *v.* | MAGISTRATE JUDGE PATRICIA T. MORRIS |

COMMISSIONER OF SOCIAL SECURITY,

　　　*Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 18, 19)**

**I.　　RECOMMENDATION**

　　　In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that McElhannon is not disabled. Accordingly, **IT IS RECOMMENDED** that McElhannon's Motion for Summary Judgment, (Doc. 18), be **DENIED**, that the Commissioner's Motion, (Doc. 17), be **GRANTED**, and that this case be **AFFIRMED**.

**II.　　REPORT**

　　　**A.　　Introduction and Procedural History**

　　　Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Alexandria McElhannon's ("McElhannon") claim for a period of disability and Supplemental Security Income Benefits ("SSI") under Title XVI of the

1

Social Security Act 42 U.S.C. § 1381 *et seq.* (Doc. 4). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 19).

McElhannon previously filed an application for SSI on August 12, 2010, alleging a disability onset date of October 28, 2008. (Tr. 118). The claim was denied after a hearing before ALJ B. Lloyd Blair in January 2012. (Tr. 115-27). McElhannon did not appeal the decision. (*Id.*).

On February 13, 2012, McElhannon filed a renewed application for SSI, alleging a disability onset date of March 1, 2011. (Tr. 243-48). The Commissioner denied her claim. (Tr. 128-38). McElhannon then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on May 7, 2013, before ALJ George Gaffaney. (Tr. 95-114). At the hearing, McElhannon—represented by her attorney, Erica Riggs—testified, alongside a Vocational Expert ("VE"). (*Id.*). The ALJ's written decision, issued July 11, 2013, found McElhannon not disabled. (Tr. 15-24). On December 24, 2014, the Appeals Council remanded the case, with instructions to "[o]btain additional evidence concerning the claimant's impairments," "[g]ive further consideration to the claimant's maximum residual functional capacity and provide rationale with specific references to evidence of record in support of assessed limitations," and "[i]f necessary, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base . . . ." (Tr. 158). A new hearing was held on July 8, 2014, (Tr. 44-94), after which ALJ David Mason, Jr. issued a decision finding McElhannon not disabled, (Tr. 15-43). The Appeals Council denied review on August 11, 2016, (Tr. 1-6), and Henry filed for judicial review of that final decision on October 4, 2016. (Doc. 1).

### B.     Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that

4

she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found McElhannon not disabled under the Act. (Tr. 18-37). At Step One, the ALJ found that McElhannon had not engaged in substantial gainful activity since February 13, 2012, the application date. (Tr. 20). At Step Two, the ALJ concluded that the following impairments qualified as severe: degenerative disc disease, cervical and lumbar radiculopathy; lumbar spondylosis; arthritis

of the hips; asthma; seizures; carpal tunnel syndrome; adjustment disorder with depression and psychosis; bipolar disorder, mixed; cannabis dependence; chronic pain disorder; migraine headaches; and alcohol dependence, in remission. (Tr. 21). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 21-23). Thereafter, the ALJ found that McElhannon had the residual functional capacity ("RFC") to perform sedentary work with the following additional limitations:

> [S]he should never use ladders, ropes, or scaffolds. She can occasionally climb ramps and stairs. She can occasionally stoop, kneel, crouch, crawl, and balance. She should avoid walking on uneven surfaces. She should avoid concentrated exposure to fumes, odors, dust, gases, or poorly ventilate [sic] areas and or respiratory irritants. The claimant requires the use of [a] cane to ambulate. She is limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements involving only simple work related decision [sic] with few if any work place changes; job with an SVP rating of one or two involving one-, two-, or three-step instructions in a moderate noise level environment that would be light industrial to office setting. She is limited to work involving only occasional contact with coworkers, supervisors, and the general public; and work involving no more than frequent bilateral reaching with the upper extremity, and occasional bilateral overhead reaching. The claimant can sit for 30 minutes at a time, and stand for up to five minutes at a time but could alternate two times every hour. She should avoid concentrated exposure to extreme cold. She requires a job that would allow her to be off task eight percent of the workday due to pain and mental health symptoms. She is limited to frequent handling, fingering, and feeling with the left non-dominant hand; and no more than frequent turning of her head in any direction including up or down or side to side, or held in a static position.

(Tr. 23). At Step Four, the ALJ found McElhannon incapable of performing her past relevant work. (Tr. 35). But proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . ." (Tr. 36).

### E.      Administrative Record

### 1.      Medical Evidence

The Court has reviewed McElhannon's medical records. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 2.      Application Reports and Administrative Hearing

### i.      Function Report

On March 4, 2012, McElhannon filled out a Function Report which appears in the record. Describing her conditions, she noted "my back will hurt from time to time," and her "legs give out just different pain shoots through my lower back and legs." (Tr. 311). "I also have bad headache[s], [d]epression, [and] stressing." (*Id.*). The pain interfered with her sleep. (Tr. 312). From the time she wakes until going to bed, she will "take my son to school," "do homework with him," and "relax." (*Id.*). Before her illnesses, she would "walk," and "run." (*Id.*). She requires reminders to take her medicine. (Tr. 313).

McElhannon continued to prepare sandwiches and dinner on a daily basis, which took her approximately an hour. (*Id.*). She also cleaned, did laundry, and ironed clothes for about two hours a week. (*Id.*). She lacks motivation to do these things, and the housework can cause pain. (Tr. 313-14). She left the house "[o]nly to go to drop off my son," or shop at the "store." (Tr. 314). "I don't like to" go out alone "and I'm scared to." (*Id.*). She did not drive due to a past car accident. (*Id.*). When she did go shopping—about once a month—she searched for household items and groceries. (*Id.*). She retained the capacity to handle her finances. (*Id.*). She watched television every day, and talked over the phone

"[e]very other day." (Tr. 315). "I don't talk or go out to do social activities, I like to stay home." (Tr. 316).

Prompted to mark abilities with which she encountered difficulty, McElhannon marked: lifting, squatting, bending, standing, reaching, walking sitting, hearing, stair climbing, memory, concentration, and using hands. (*Id.*). "I can't lift any[thing] over 10 [pounds] and I may only . . . walk a mile or two." (*Id.*). She could walk half a block before needing to stop and rest for forty-five minutes to an hour. (*Id.*). She could pay attention for only a short amount of time, as her memory was "not that good," but she had no problems following written instructions. (*Id.*). She used a cane "[e]veryday and all day to walk or climb stairs," which was prescribed in September 2011. (Tr. 317).

### ii.      McElhannon's Testimony at the Administrative Hearings

At her first hearing, on May 7, 2013, McElhannon opened her testimony by noting that her last job was "home healthcare," and she quit because "[t]he pain in my back had gotten worse." (Tr. 99). "The pain that I have in my back, my mental condition, and the medication that I take" all kept her from working; "[s]ometimes I am not able to get up and take my son to school because of the pain." (Tr. 100). She could sit for "[m]aybe 25 minutes" at one time without pain, drawing her to "lay down and rest" before resuming her daily activities. (Tr. 100-01). "I can stand no longer than five minutes." (Tr. 101). Lifting and carrying objects also proved "[v]ery difficult." (*Id.*). Although she attends physical therapy, she indicated that it had little effect on her pain. (Tr. 102). And as a result of her headaches, which started about a year and a half before the hearing, "I have to be in the

dark" for "maybe three hours until my headache has released." (*Id.*). This happened about three times a month. (Tr. 103).

McElhannon went on to discuss mental health issues. "I have mental issues: bipolar, paranoia, hallucination as far as talking to the dead, seeing the dead. I am very paranoid. I have insomnia where I can't sleep at night. I stay up for days." (*Id.*). These symptoms worsened in the three months leading up to the hearing. (*Id.*). Two side effects became forgetting things and not being able to concentrate. (Tr. 104). Though she continued to take her medications, they did not help her. (Tr. 105). As to her history of substance abuse, she indicated that she stopped "[a]bout a year and a half ago" and had suffered no relapses. (*Id.*). She took naps "maybe twice a day" for "four to six hours" total. (*Id.*).

McElhannon's son and daughter helped her accomplish chores around the house, though she could wash dishes if she took breaks "in regards to my lower back [and hip] pain . . . ." (Tr. 106). She could take care of hygiene and dressing herself, "[b]ut preparing food and things like that, I have to get help." (Tr. 107).

At the second hearing, on July 8, 2015, McElhannon was asked about prior work at a factory. (Tr. 51). She noted that she "was working in a factory putting DVDS in . . . the casings," and that she "worked for that company for at least eight months." (*Id.*). She stopped working there "[b]ecause I had asthma and bronchitis real bad and the factory was real dusty, so I could no longer work there and it had all the dust." (*Id.*). Without the asthma and bronchitis, she would have continued the job. (Tr. 52). But she also said she could not do that job at the time of the hearing, because "[t]he pain that I endure and things have gotten worse[]." (*Id.*). This is because in early 2013, "I had a few slip and fall accidents

during the weather that we had, when we had the bad weather storm." (*Id.*). "I can't stand up at a job for a long time and I really can't sit down because of the pains that shoot[] through my back and my legs and things like that." (Tr. 53).

Though McElhannon did not have a driver's license, she held a permit. (Tr. 55). People visited her "[w]hen I feel like being bothered"—a biweekly basis. (*Id.*). Visitation decreased since 2013. (Tr. 58). "I don't have any hobbies because of my condition." (Tr. 56). She did, however, have 200 friends on Facebook. (*Id.*). She smoked "[t]hree cigarettes a day" and did not travel. (*Id.*). A neighbor acquired marijuana for her, which she smoked "[w]hen I don't have my pain meds"—about twice a week. (Tr. 57). At this juncture, the ALJ confronted McElhannon with some inconsistencies between this testimony and statements which appeared in her doctors' notes: "[I]t's the elephant in the room. Throughout your mental health treatment, your doctors have often talked to you about the marijuana usage up to daily. . . . [Y]ou indicate that you have used marijuana when you didn't have medication. But it appears you have also used marijuana when you have had the medication. And then . . . the issue where you say that it doesn't impact you, that it doesn't have any adverse effect for you, but in the same sentence you indicate that it could have an impact on your anxiety or depression or your mental symptoms." (Tr. 59-60). To this, McElhannon began to describe some of her medications, noting that she got "numbness, tingling[], dizziness, hot flashes, [and] nausea" from her pain pills. (Tr. 61). They also affected her appetite and sleep. (Tr. 62).

Prompted to do so, McElhannon began to rate the pain in various parts of her body. She rated the pain in her shoulders at an eight out of ten, the pain in her feet as a seven, the

pain in her back as a ten at all times. (Tr. 63). "I can make sandwiches and maybe heat up things in the microwave, but my daughter does the cooking," and her daughter helped her dress and bathe herself. (Tr. 63-64). To go grocery shopping, McElhannon had a family member take her to the store and used an electric cart. (Tr. 64). She indicated that she did not do laundry, fold clothes, make the bed, vacuum, sweep, take out the garbage, do yard work, garden, mow the lawn, or shovel snow. (Tr. 64-65). During the course of the day, "I will watch the news, try to take care of important phone calls, and try to keep up with my appointments." (Tr. 65). She went outside "[s]ometimes" and watched television during the day. (*Id.*). She could walk a block and a half before needing to stop. (Tr. 66). She used her cane consistently since it was prescribed in 2011. (Tr. 66). She could stand for about twenty minutes, but not without the assistance of her cane. (Tr. 67). And even *with* the assistance of a cane, she had fallen six or seven times in the past years. (Tr. 75). Due to her arthritis, McElhannon could neither bend with ease nor climb stairs. (Tr. 68-69).

The ALJ questioned her as to her bad days and good days. She testified to having bad days "four times out of a week," on which she did not "want to be bothered" and closed herself "in my room and lie[d] there." (Tr. 74). The pain on those days was "worse." (*Id.*).

### iii.        The VE's Testimony at the Administrative Hearing

The VE at the first hearing, on May 7, 2013, was first asked about McElhannon's only past work as a self-employed hairstylist. (Tr. 109). "Assuming these facts to be accurate, my first hypothetical limits lifting to 20 pounds occasionally and 10 frequently. Stand and sit six hours each in an eight hour work day. The non-exertional are all limited to just occasional. Stairs, stoop, balance, kneel, crouch, and crawl. I am going to limit to

11

simple routine tasks with just occasional change in the routine work setting. Could the past work be performed?" (Tr. 109-10). The VE said that "[n]o," such a person could not perform McElhannon's past work as a hairstylist. (Tr. 110).

The ALJ then asked: "could someone the same age, education, and work experience of the claimant [work] other jobs that could be performed with this profile?" (*Id.*). The VE provided a number of other "light, unskilled jobs," including: "work as a cleaner"—with 1,500 regional job availabilities and 200,000 national job availabilities—"work as a fast food worker"—with 3,200 regional job availabilities and 95,000 national job availabilities—and "work as a vending attendant"—with 700 regional job availabilities and 60,000 national job availabilities. (*Id.*).

For the ALJ's second hypothetical, he limited "lifting to 10 pounds occasionally, five frequently, stand two hours in an eight hour work day, sit for six. The rest stays the same as in the first hypothetical. Are there jobs that could be performed with this profile by someone the same age, education, and work experience as the claimant?" (Tr. 110-11). The VE noted that "sedentary unskilled jobs" existed for such a worker. (Tr. 111). These included: "work as a ticket checker"—with 400 regional job availabilities and 13,000 national job availabilities—"work as an assembler"—with 300 regional job availabilities and 12,000 national job availabilities—and "work as an addresser"—with 500 regional job availabilities and 20,000 national job availabilities. (*Id.*).

In his third hypothetical, the ALJ said "number two, plus miss three days a month." (*Id.*). Under such circumstances, the VE said that no competitive employment could be attained with those conditions. (*Id.*).

12

McElhannon's attorney then posed a hypothetical involving a person "unable to meet competitive standards in the following categories: maintaining attention for two hour segments, maintain regular attendance, and be punctual within customary tolerances, perform at a consistent pace without unreasonable number and length of rest periods," such that the person "would [be] off task for a total of 25 percent of the work day, within those parameters." (Tr. 112). The VE acknowledged that "[n]o work would be possible under that hypothetical." (*Id.*).

The VE at the second hearing, on July 8, 2015, faced the following hypothetical person: "This individual would be limited to sedentary work, as it is defined in the regulations. No ladders, ropes, or scaffolds, occasional ramps, stairs, stoop, kneel, crouch, crawl, and balance. Should avoid walking on uneven surfaces, should avoid concentrated exposure to fumes, odors, dusts, gases, poorly ventilated areas, and/or respiratory irritants. Limited to jobs that will allow the use of a cane to ambulate. Further limited to simple, routine, repetitive tasks in a work environment free of fast paced production[] requirements involving only simple work related decisions with few, if any, workplace changes. And further, this should be work that has a vocational preparation – as specific vocational preparation of 1 or 2 or involving one, two, or three step instructions. If the individual had those limitations, would that individual be able to perform any competitive work?" (Tr. 84-85). The VE named several jobs that such a person could perform, including "a simple, sorting inspecting job[]"—with 2,000 regional job availabilities and 200,000 national job availabilities—"a simple packaging and packer type job[]"—with 250,000 national job availabilities—and "an order clerk"—with 215,000 national job availabilities. (Tr. 86-87).

In the second hypothetical, the ALJ asked whether jobs existed for such a person if "in a moderate noise level environment that would be a light industrial to an office setting, . . ." (Tr. 87). The VE said that no positions existed.

In his third hypothetical, the ALJ asked: "If you were to further limit this individual to occasional contact with coworkers and supervisors and the general public, that no more than frequent bilateral reaching with the upper extremity, and occasional bilateral overhead reaching. Further, this individual could only sit for 30 minutes at a time and they'd be able to stand for up to five minutes at a time, but could alternate twice an hour. And no concentrated exposure to extreme cold. And this individual would be off task 8 percent because of pain and depression or mental health symptoms. . . . Could any of the jobs be performed or would there be other jobs?" (Tr. 87). The VE indicated that "with occasional contact with the general public, the order clerk would be ruled out, even though it would be mostly contact over the phone. The packaging jobs would be reduced to about 50 percent would remain." (Tr. 87). In addition, "the sorting job would also be reduced to about 100,000 nationally, given the need to alternate." (Tr. 88).

The fourth hypothetical further limited the individual to "no more than frequent handling, fingering, and feeling with the left non-dominant hand," but the VE indicated that such a limitation "would not" change the job numbers given. (*Id.*). In the fifth hypothetical, the ALJ limited the individual further "to no more than frequent turning of the head and any direction that's up or down or from side to side, or held in a static position, would that change the jobs or the numbers?" (*Id.*). The VE did not highlight any change in job numbers. In the sixth hypothetical, the ALJ added that the individual was to miss "four

14

days a month," which the VE indicated was work preclusive. (Tr. 89). In the seventh hypothetical, the ALJ swapped this limitation for one in which the individual was "to be off task 15 percent" of the time, which the VE said "would be difficult to sustain a competitive current work base." (*Id.*). And in the eighth hypothetical, the ALJ added that the individual "had to lie down one hour a day during the work day . . . in addition to breaks and a meal period," which the VE noted was work preclusive. (Tr. 89-90).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner,

such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or

16

equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

17

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication .
       . . taken to alleviate . . . pain or other symptoms;

18

    (v)      Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore,

the claimant's work history and the consistency of his or her subjective statements are also

relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

       The claimant must provide evidence establishing her RFC. The statute lays the

groundwork for this, stating, "An individual shall not be considered to be under a disability

unless he [or she] furnishes such medical and other evidence of the existence thereof as the

Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5.

The RFC "is the most he [or she] can still do despite his [or her] limitations," and is

measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

A hypothetical question to the VE is valid if it includes all credible limitations developed

prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.

1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D.

Mich. Dec. 9, 2009).

       In the Sixth Circuit, a prior decision by the Commissioner can preclude litigation in

subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior claim, adjudicators must
> adopt such a finding from the final decision by an ALJ or the Appeals Council
> on the prior claim in determining whether the claimant is disabled with respect
> to the unadjudicated period unless there is new and material evidence relating
> to such a finding or there has been a change in the law, regulations or rulings
> affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The applicable regulations explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Ultimately, the *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review.").

In *Drummond*, the Sixth Circuit held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843. The court later reaffirmed this principle in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond. See generally Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-*9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she

has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*[1]

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No. 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding.

To overcome this presumption, the Sixth Circuit has consistently anchored the analysis on the comparison between the "circumstances existing at the time of the prior decision and the circumstances existing at the time of review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). The court explained in a case predating *Drummond*: "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her

---

[1] Tension exists in the case law addressing whether *res judicata* applies to pre-hearing determinations. *Compare Wilson v. Califano*, 580 F.2d 208, 211 (6th Cir. 1978) (noting that *res judicata* can apply even where "no oral hearing was held before an ALJ on the prior application"), *with Asbury v. Comm'r of Soc. Sec.*, 83 F. App'x 682, 684 n.1 (6th Cir. 2003) ("We recognize that the applicability of the *Drummond* analysis is not clear with respect to administrative decisions that do not follow 'trial-type' hearings."). This heretofore unresolved issue can generate difficult questions, and courts typically will not address it unless raised and argued by the parties to a case. *See, e.g.*, *Johnson v. Comm'r of Soc. Sec.*, No. 13-CV-14797, 2015 WL 730094, at *3 n.2 (E.D. Mich. Feb. 19, 2015) (declining to address the doctrine's applicability to an initial determination in light of "the tensions in the case law and the parties' failure to raise the argument").

condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-1233 (6th Cir. 1993). The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration.[2] *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988, at *2, *8-*9. The relevant change in circumstances is not a change in the availability of evidence but a change in the plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter v. Heckler*, 771 F.2d 682, 691-93 (3d Cir. 1985) (discussing reopening as an exception to claim preclusion). The first, less important to *res*

---

[2] I note, as well, that an equally important corollary to this principle dictates that an ALJ may not find *improvement* in a claimant's condition absent new and material evidence thereof following an already adjudicated period. *See, e.g.*, *Albanna v. Comm'r of Soc. Sec.*, 2016 WL 7238925, at *15 (E.D. Mich. Nov. 22, 2016) (finding an ALJ erred by calling the claimant's illiteracy into question based on "thinly substantiated doubts" where a prior decision found him illiterate); *see also Drummond*, 126 F.3d at 842-43; *Hamblin v. Apfel*, 7 F. App'x 449, 451 (6th Cir. 2001).

*judicata* case law, occurs just after the initial determination when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407. The more critical and complicated mechanism is reopening a prior ALJ decision.

The regulations pertaining to reopening permit the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F.R. §§ 404.987, 404.992, 416.1487, 416.1492. Either the claimant or the Commissioner can initiate the process. *Id.* A determination or decision may be reopened "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims, or four years for DIB claims. *Id.* §§ 404.988, 416.1488. Good cause exists if, among other reasons, "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened properly, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977). Courts may, however, review a decision *not* to reopen a case in order "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer*, 40 F. App'x

at 690 ("'[W]e will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))).

Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). Such a reopening occurs where the ALJ reviews the entire record, including portions from the already adjudicated period, and decides "the merits of the claim." *Tobak*, 195 F.3d at 186. One factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata* doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because

24

more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

### G.   Analysis

As an initial matter, the ALJ regarded the Commissioner's prior determination as to McElhannon's disability, noting that the unfavorable decision was not appealed and thus became binding on all parties. (Tr. 23). He then properly outlined the *res judicata* standard under *Drummond* and the relevant regulations, finding that the evidence showed "a change in circumstances," that there existed "newly alleged and diagnosed impairments since the prior decision," but that there was "no 'new and material evidence' under the criteria set forth in the regulations that exists pertaining to the current period of adjudication that would provide a basis for finding a different residual functional capacity," and that in fact "the record reflects improvement in the claimant's ability to walk . . . [and] actual physical functioning . . . ." (Tr. 24). It appears the ALJ applied the proper standard under *Drummond* and the relevant regulations.

McElhannon puts forth two general arguments in her brief: (1) the ALJ "violated the procedural aspect of the treating physician rule in evaluating the medical source opinion of" her "treating physician, Dr. Fouad Batah," (Doc. 18 at ID 936) (bolding removed); and (2) the ALJ "failed to create an accurate residual functional capacity assessment and therefore erroneously found work at Step Five," (Doc. 18 at ID 939) (bolding and capitalization removed). I consider each argument in turn.

25

## 1.    Treating Physician Rule

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "treating source's opinion." *Id* § (c)(2). In weighing a treating source statement, the ALJ considers the length of the treatment relationship and frequency of examination, as well as the nature and extent of the treatment relationship. *Id.* § (c)(2)(i)-(ii). Where a treating source's opinion proves "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it "controlling weight." *Id.* § (c)(2). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

26

In this case, McElhannon avers that "the ALJ's reasons for giving Dr. Batah's opinion little weight are based off speculation and not supported by substantial evidence." (Doc. 18 at ID 938). As McElhannon correctly points out, the ALJ cited as a reason for discounting Dr. Batah's opinion a suspicion that Dr. Batah grounded his opinion on McElhannon's subjective complaints:

> The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints.

(Tr. 29). According to McElhannon, "[t]he ALJ's use of the qualifier[]s 'apparently' and 'seemed to' are clear indications that his reasons are not supported by substantial evidence," and thus they fail to constitute "good reasons" for discounting Dr. Batah's opinion, as required under the regulations. (Doc. 18 at ID 938). Contrary to the ALJ's assessment, McElhannon suggests that Dr. Batah's opinions—which note "positive straight leg raises test and positive paraspinal muscle spasms"—are consistent, thorough, and objective. (Doc. 18 at ID 939) (citing Tr. 841-42, 847).

"If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). The ALJ here did not entirely disregard Dr. Batah's findings. Certain aspects of Dr. Batah's opinion— namely, his opinion as to her neck movement limitations, her hand-use limitations, and her ability to sit for six hours in a work day—were granted some weight because they were "consistent with treatment notes," and to the extent the record substantiated them, are

reflected in the RFC. (Tr. 29); (Tr. 23) ("The claimant can sit for 30 minutes at a time, and stand for up to five minutes at a time but could alternate two times every hour. . . . She is limited to frequent handling, fingering, and feeling with the left non-dominant hand; and no more than frequent turning of her head in any direction including up or down or side to side, or held in a static position."). The rest, he reasoned, appeared based not on objective evidence but rather McElhannon's subjective statements. (Tr. 29). Indeed, Dr. Batah's RFC assessment incorporates no reference to objective evidence, and like his treatment notes, contains a number of findings that mirror McElhannon's well-documented complaints. (Tr. 836) (listing "chronic" back or neck pain, without elaboration, as McElhannon's diagnoses and symptoms, with "[t]enderness" and "no motor deficits" listed under 'objective evidence or clinical findings'). *Compare* (Tr. 836), *with* (Tr. 720-22) (noting complaints of back pain and, despite a negative MRI, diagnosing chronic back pain); (Tr. 738-40) (diagnosing chronic back pain due to tenderness; finding normal reflexes); (Tr. 747-48) (normal physical exam but continued diagnosis of chronic back and neck pain). The ALJ's inference on this count was a reasonable one. *See, e.g.*, *Tate v. Comm'r of Soc. Sec.*, 467 F. App'x 431, 433 (6th Cir. 2012) (upholding an ALJ's finding that a treating physician's opinion "*appeared* to be based on Tate's subjective complaints, without sufficient support from objective clinical or neurological findings" (emphasis added)); *McCoy ex rel. McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995) ("Subjective claims of disabling pain must be supported by objective medical evidence in order to serve as the basis of a finding of disability."); *Teverbaugh v. Comm'r of Soc. Sec.*, 258 F. Supp. 2d 702, 705 (E.D. Mich.

2003) (finding a medical report's dearth of objective findings to signify reliance on "subjective complaints related by the claimant").

Although McElhannon highlights evidence in line with Dr. Batah's opinion—such as her prescriptions for strong pain medication, her positive straight-leg raise tests, her emergency-room trips, and her muscle spasms—the ALJ also took this evidence into account. After discussing these factors, however, he noted that "[t]he objective record does not indicate any acute abnormalities beyond pain" in McElhannon's back:

> [T]here was no muscle wasting or difficulty moving all extremities. Furthermore, her range of motion was consistently noted to be intact throughout the record; strength was 5/5 in bilateral upper and lower extremities. Finger-to-nose was intact bilaterally; normal bulk and tone was noted; she was able to walk on her heels, toes, and tandem walk without difficulty; her gait was normal.

(Tr. 27). The ALJ properly weighed this evidence, and his opinion on this count is supported by substantial evidence.

## 2.    Residual Functional Capacity and Step Five

McElhannon next contends that the ALJ's RFC is deficient in a number of ways, leading to improper Step Five conclusions. She highlights three separate errors in particular: (i) four "disabling medical source statements from four different sources . . . . all opined that [McElhannon] is unable to work," yet the ALJ found otherwise; (ii) the ALJ found medical improvement despite adding more limitations to the RFC assessment compared to the prior decision; and (iii) the ALJ failed to adequately limit McElhannon's ability to turn her head, "especially in light of [her] chronic and severe migraine headaches routinely requiring emergency room treatment for abortive care." (Doc. 18 at ID 940).

The first allegation as to error lacks merit. McElhannon bears the burden of proving that she requires a more restrictive RFC. *Accord, e.g.*, *Perdue v. Colvin*, No. CV 15-14006, 2017 WL 362668, at *3 (E.D. Mich. Jan. 9, 2017), *report and recommendation adopted sub nom. Perdue v. Comm'r of Soc. Sec.*, No. 15-14006, 2017 WL 976790 (E.D. Mich. Mar. 14, 2017) (citing *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994)); *Ronning v. Colvin*, No. CV 14-11893, 2016 WL 3319690, at *4 (E.D. Mich. May 20, 2016), *report and recommendation adopted sub nom. Ronning v. Comm'r of Soc. Sec.*, No. 14-11893, 2016 WL 3181906 (E.D. Mich. June 8, 2016) (citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)). Because she does not challenge the weight given these sources—and does not elaborate on why or how their consistency should have effected a change to the RFC analysis—she cannot show the ALJ erred on this ground. *Cf. Berry v. Comm'r of Soc. Sec.*, No. 16-10548, 2016 WL 7664225, at *11 (E.D. Mich. Dec. 8, 2016), *report and recommendation adopted,* No. 16-10548, 2017 WL 67458 (E.D. Mich. Jan. 6 2017) ("Berry gives no indication what additional restrictions might be necessary to accommodate his conditions, but merely mentions the possibility that the ALJ *could have* included more restrictive limitations in his RFC assessment. . . . Instead, he leaves it to the Court to determine which further restrictions might be appropriate. Berry's underdeveloped argument should be found waived." (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997))).

The second allegation, couched as a violation of *res judicata*, likewise lacks merit. A generalized challenge to the ALJ's failure to find deterioration in a claimant's condition cannot—without citation to the record and showing of prejudice—unveil the absence of

substantial evidence for the ALJ's decision. *See, e.g.*, *Creech v. Comm'r of Soc. Sec.*, 581 F. App'x 519, 521 (6th Cir. 2014) (plaintiffs must show prejudice from a failure to properly follow procedures). Even assuming an inconsistency between the ALJ's finding improvement in McElhannon's condition and his RFC finding, the RFC at issue proves substantially more restrictive than those in prior decisions. *Compare* (Tr. 23), *with* (Tr. 122-23, 145). As such, McElhannon cannot achieve remand for any *res judicata* error. *E.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Ford v. Berryhill*, No. 5:16-CV-00115-LLK, 2017 WL 2531588, at *3 (W.D. Ky. June 9, 2017) ("[E]ven if the ALJ did not identify new and material evidence of a change warranting departure from the prior RFC, the error was harmless if the current RFC was more claimant-favorable than the prior one."); *Clayton v. Comm'r of Soc. Sec.*, No. 2:15-CV-12249, 2016 WL 5402963, at *3 (E.D. Mich. Sept. 28, 2016) ("[W]here a latter [RFC] is more restrictive than the prior RFC, a Plaintiff is unable to demonstrate the prejudice or harm necessary to achieve a remand.").

The third allegation as to error should also fail. The ALJ considered and discussed evidence relating to McElhannon's migraines extensively, noting that medications and treatment therefor had proven effective in the past, and (in an appropriate manner) second-guessed the professed severity of the limitations and pain her neck movement generated. (Tr. 26) ("[P]atient was observed leaving the clinic walking to her transportation with an increased cadence, no assistive device, and bilateral head turns without loss of balance."); (Tr. 27) ("MRIs were negative . . . . However, she complained of stiff joints and continuing

neck and back pain . . . ."); (Tr. 28) ("[T]he record indicates that the claimant sought Emergency Room treatment for headaches in 2012 and 2013 when she ran out of Vicodin . . . . The claimant underwent an MRI and MRA study at the request of her neurologist in October 2012, which were unremarkable . . . . She was prescribed with Imitrex with good results . . . ."). McElhannon does not provide any citation alongside this argument aside from a reference to Dr. Batah's opinion, (Doc. 18 at ID 940)—which, as discussed above, the ALJ properly afforded little weight. In any case, the record buttresses the ALJ's conclusion. *E.g.*, (Tr. 583, 680) (admitting that available treatment—medication or shots— alleviated her headaches); (Tr. 708) (demonstrating an ability to turn her head without losing balance); (Tr. 470-72) (unremarkable MRI and MRA studies); (Tr. 530-31, 542, 545) (visiting the emergency room after running out of medication).

Because McElhannon cannot show error in the ALJ's RFC findings, neither can she undermine the VE's testimony, upon which the ALJ relied at Step Five. *E.g.*, *Shauf v. Sec'y of Health & Human Servs.*, 12 F.3d 214, at *1 (6th Cir. Dec. 10, 1993) (unpublished table decision) ("[T]here is no requirement that the ALJ's hypothetical questions to the VE reflect the claimant's unsubstantiated complaints.").

For these reasons, McElhannon cannot show any error in the ALJ's Step Four or Step Five determination, and thus the ALJ's decision is supported by substantial evidence.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that McElhannon's Motion for Summary Judgment, (Doc. 18), be **DENIED**, the Commissioner's Motion, (Doc. 19), be **GRANTED**, and that this case be **AFFIRMED**.

## III.  __REVIEW__

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 1.4 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 27, 2017                              S/ PATRICIA T. MORRIS
                                                  Patricia T. Morris
                                                  United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 27, 2017                               By s/Kristen Castaneda
                                                  Case Manager